## The Colonial Trust Co., Appellant, *v.* The Central Trust Co. and Clara J. Kirkland, Appellant.

*Contracts—Promissory notes—Pledges—Pledge of securities as collateral—Right to sell pledge—Stock certificates.*

1. Legal rights are as safe in chancery as they are in a court of law and however strong an appeal may be to the conscience of a chancellor for equitable relief he is powerless to grant it if the one from whom it must come will be deprived of a legal right.

2. Where securities are pledged as collateral for a loan under a contract authorizing the pledgee to sell at public or private sale at his option, on the failure of the pledgor to pay, without demand, advertisement or notice, with the right in the pledgee to purchase at such sale, free of all claims and trusts, the pledgee in the absence of fraud, has the right to purchase the securities at a private sale.

3. In a suit in equity where the bill prayed that a sale to itself by the pledgee of certain securities pledged be declared void, and that an amount realized on a subsequent sale in excess of the indebtedness for which the securities were pledged be awarded to the trustee in bankruptcy of the pledgor, it appeared that the pledgor had deposited the securities as collateral for the payment of certain demand notes made in favor of the pledgee for money loaned wherein provision was made for the sale of the securities at public or private sale, with the right in the pledgee to become the purchaser thereof. On the refusal of a demand for the amount of the notes the pledgee notified the pledgor's trustee in bankruptcy that the collateral would be sold at the office of the pledgee at an hour named. The securities were accordingly sold and the pledgee became the purchaser at a price equal to the pledgor's then indebt-

COLONIAL TR. CO., Appellant, v. CENTRAL TR. CO. 269

edness. Thereafter the securities were sold by the pledgee at an amount in excess of the pledgor's indebtedness to the pledgee. It did not appear that any fraud or deception had been practiced by the pledgee previous to or at the time of the sale of the pledged securities, or that the pledgee did not have the legal right to sell the same. At the time of the sale the market value of the securities was on the decline and had the sale been delayed a month longer the pledgee would have sustained loss. *Held,* that the title to the securities acquired by the pledgee was an absolute one and the court properly dismissed the bill.

*Corporations—Certificates of stock—Fraudulent pledge of stock certificates—Endorsement in blank—Estoppel.*

4. Where the owner of stock executes a power of attorney in blank on the back of the stock certificate without restriction or condition and delivers the same for sale to a broker who fraudulently pledges the stock as collateral for loans, the innocent pledgee will take the stock divested of all claims on the part of the one defrauded.

5. In such case the owner of certain of the stock pledged who had delivered the same to the pledgor's bookkeeper, acting for the pledgor, for sale, having previously endorsed in blank a power of attorney on the certificate of stock, sought by cross-bill to secure the award to her of the fund claimed by the pledgor's trustee in bankruptcy; it appeared that the pledgor had pledged the stock as his own and that there was nothing to put the pledgee upon notice that the stock had been fraudulently converted by the pledgor. *Held,* that no distinction could be made between the claims of the plaintiff and that of the cross-plaintiff, and that the court made no error in dismissing the cross-bill.

MR. JUSTICE STEWART dissents.

Argued Oct. 27, 1913. Appeals, Nos. 146 and 162, Oct. T., 1913, by plaintiff and cross plaintiff, from decree of C. P. Allegheny Co., Jan. T., 1911, No. 360, in equity, dismissing bill and cross-bill in equity in case of The Colonial Trust Company, a corporation, Receiver of John A. Wood, Jr., bankrupt, v. The Central Trust Company, a corporation, and Clara J. Kirkland. Before FELL, C. J., BROWN, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Bill in equity to set aside the sale of pledged securities

and cross-bill in equity for the return of certain stock to the cross plaintiff alleged to have been secured from her by fraud.  Before HAYMAKER, J.

From the record it appeared that plaintiff had filed a bill in equity praying that a sale to itself by the Central Trust Company of securities pledged to it by John A. Wood, Jr., be declared void and that the excess over his indebtedness to it, which it realized on subsequent sales of the said securities, be awarded to his trustee in bankruptcy.  The cross-bill was filed by a customer of Wood, who had left with him for sale, a certain stock certificate.  He hypothecated this for his indebtedness to the Central Trust Company, and it was sold with the other securities enumerated in the bill.  The prayer of the cross bill was that the surplus claimed by Wood's receiver in bankruptcy be awarded to her.

In dismissing the bill the court found the following facts:

1. The Colonial Trust Company and The Central Trust Company are corporations of the State of Pennsylvania, domiciled in the City of Pittsburgh, and lawfully engaged in the banking business.

2. John A. Wood, Jr., was a stock and bond broker, with offices in said city, and at one time had in his employ H. M. Ilyus as bookkeeper.

3. On January 14, 1910, The Colonial Trust Company, the plaintiff in the original bill filed, was appointed receiver in bankruptcy of the estate of John A. Wood, Jr., and soon thereafter it was appointed trustee in bankruptcy of that estate.

4. On October 13, 1909, John A. Wood, Jr., borrowed from the Colonial Trust Company $1,500.00 and gave his collateral promissory note, and delivered therewith 100 shares of preferred stock of the Independent Brewing Company as security for the payment thereof.  That note, with the terms of hypothecation appended, is as follows:

"$1,500.00               PITTSBURG, PA., October 13, 1909.

"On demand after date I promise to pay to the order of myself at the Central Trust Company of Pittsburgh, Fifteen Hundred Dollars, without defalcation, for value received, having deposited herewith as collateral security for the payment of this or any other liability or liabilities of mine to the holders hereof, now due or to become due or may hereafter be contracted, the following property, viz:

"100 Shares Independent Brewing pfd.

"The market value of which is $......, with further right to the holder hereof to call for additional security should there be a decline in the market value, or on failure to respond, this obligation shall be deemed to be due and payable without demand or notice, with full power and authority to the said holder to sell, assign and deliver the whole or any part of said security, any substitute therefor, or any addition thereto, at any Broker's Board, public or private sale, at the option of the holder, on the non-performance of this promise, or of the terms hereof, at any time hereafter, without demand, advertisement or notice, with the right to the holder of becoming the purchaser and absolute owner thereof, free of all claims and trusts.

"After deducting all legal or other costs and expenses of collection, storage, custody, sale and delivery, the residue of the proceeds of any such sale or sales to be applied to the payment of any or all of the liabilities aforesaid, due or to become due said holder, returning the overplus, if any, to the undersigned; and in case of any deficiency holding me responsible therefor."

On November 1, 1909, Wood borrowed from the same company ten thousand dollars, and gave a similar note, with the same terms, of hypothecation, and delivered therewith the following securities:

5 shares of Westinghouse Electric seconds.
25  "      " Independent Brewing Company, company common.

40 shares of Westinghouse Machine Company.

25 " " Crucible Steel preferred.

100 " " " " common.

5 " " National Fireproofing common.

65 " " Sewer Pipe.

1 Pittsburgh & Allegheny Telephone Company Bond, face value $1,000.00.

At the time said loans were made by the Central Trust Company to Wood it was in possession of said securities and made the same on the strength of that possession, and in the belief that Wood was the legal owner of said securities, and had no notice that any of said securities were owned or claimed by any other person.

5. The maker of said notes made various payments on account of the larger note, whereby it was reduced to the sum of $6,300.00. The smaller note was for $1,500.00, and on this indebtedness there was interest due of $20.00, making a total claim of $7,820.00.

6. On Friday, January 14, 1910, in the forenoon, Mr. Hetzel, the secretary and treasurer of the Central Trust Company, went to the office of the maker of the notes to demand payment and to deliver the notes and collateral, but finding the office closed put the notice through the letter hole in the door. From there he went to the Colonial Trust Company, where he presented the notes to F. F. Brooks, the trust officer, for payment, about eleven o'clock, and being informed by that officer that the company did not have the funds with which to pay the notes, he said that the collateral would have to be sold, but did not at that time designate any time of sale. Between three and four o'clock of the same day Mr. Hetzel notified Mr. Brooks by 'phone that the collateral would be sold at the office of the Trust Company the next morning, Saturday, at 9:30, to which Mr. Brooks objected on the ground that the notice was too short. This verbal notice over the 'phone was followed by a written notice sent to Mr. Brooks about four o'clock on Friday evening, but was not received by him until about nine o'clock on

Saturday morning, less than half an hour before the time fixed for the sale. The following is a copy of that notice:

"Central Trust Co.,

Pittsburgh, Pa., January 14, 1910.

Colonial Trust Company,

Receiver of John A. Wood, Jr.,

Pittsburgh, Pa.

Gentlemen:

We beg to notify you that we have this day demanded payment on the notes of John A. Wood, Jr., held by this company, and said notes not being paid we will offer the collateral for sale Saturday morning, January 15, 1910, at 9:30 o'clock, in the above office.

H. G. HETZEL,

Treasurer."

The trustee of Wood's estate protested against the sale, principally on the ground that the securities were all marketable, that there was a substantial equity in the loan and that they should be sold on the exchange or at a certain office where public sales at that time were being made.

7. On Saturday morning, January 15, 1909, at ten o'clock the collateral securities were sold in the office of the secretary-treasurer of the pledgee, in a room adjoining the banking room, and were purchased by the pledgee, represented by its president, at a price or sum equal to the then indebtedness of the pledgor. The only persons present at the sale were certain officers and counsel for the pledgee, and Mr. Jennings, counsel for Mrs. Kirkland. Mr. Jennings before the day of sale and at the time of the sale, protested against the sale of the twenty-five shares of Crucible Steel on the ground that the pledgor had no title thereto at the time of pledging, and that they were then the property of Mrs. Kirkland.

8. When the pledgee learned of the failure of the pledgor it made immediate investigation of the character of the securities in its hands, with a view to protec-

tion against loss. The market value of some of the pledged stock was at times of little value; some were speculative and nondividend paying, and at the time of the sale the market was on a decline, and had the sale been delayed for a month longer the pledgee would have sustained a loss. The Westinghouse stocks were of companies then in financial difficulties.

9. On the same day that the pledged securities were purchased by the pledgee they were placed in the hands of a broker for sale, and some of them were sold on the same day, and all were sold not later than the following Wednesday, the 19th, the pledgee realizing $1,582.29 over and above the pledgor's indebtedness to the pledgee and the expenses of sale.

10. The pledgor, John A. Wood, Jr., has at no time complained of the action of the pledgee in selling the pledge, and the only objection is on the part of his trustee in bankruptcy, and that principally on the ground that the securities should have been sold on the stock exchange or some public place where there might be competition. Neither the pledgor nor his trustee in bankruptcy offered at any time to redeem the pledge, and the trustee was at no time in possession of sufficient funds to do so.

11. The pledgor made no representations to the parties interested in the sale of the securities, nor is it claimed by anyone that the pledgee practiced any deception on the pledgor or his trustee in bankruptcy at any time previous to or at the time of the sale of the pledged securities, or that the pledgee did not have the legal right to sell the same.

12. There was no proof that the securities as a whole were worth, on the day of the sale, more than the amount of the pledgee's claim.

In refusing the prayer of the cross-bill the following facts were found:

1. The plaintiff was the owner of twenty-five shares of the preferred capital stock of the Crucible Steel Com-

pany on August 25, 1909, and on that day she took her certificate to the office of John A. Wood, Jr., a stock broker, and gave it to H. M. Ilyus, his bookkeeper, with instructions to sell the same when the market reached a certain price.   Ilyus was not a stock broker;   Wood had sold stock for her on a previous occasion.

2. On leaving her stock at Wood's office she executed a blank power of attorney to assign and transfer the certificate, and her signature was witnessed by Ilyus, who turned the certificate over to Wood.

On November 1, 1909, Wood borrowed $10,000.00 from the Central Trust Company, and delivered plaintiff's certificate, with other securities, to the company as collateral security for the payment of his note given for that amount.   The pledgee had no knowledge of plaintiff's ownership of the certificate, and received the same in good faith from Wood, par value.

3. On January 13, 1910, plaintiff discovered that her certificate was in the hands of the Central Trust Company as collateral for the payment of Wood's note, and on that day served through her counsel, Jennings & Jennings, a written notice on the company of her ownership and that the same was not to be disposed of without notice to them.

On January 14, 1910, the pledgee notified her counsel that the stock would be sold on the following day at 9:30 a. m., at pledgee's place of business.   Mr. Jennings was present at the sale, and then and there gave further notice that the ownership of that certificate was in his client, the plaintiff.

4. The plaintiff's stock was sold with the other securities, and purchased by the pledgee.

Exceptions to the findings of fact and law of the trial judge were dismissed by the court and a decree was entered dismissing the bill and cross-bill.   Plaintiff and cross plaintiff appealed.

*Errors assigned* were various findings of fact and law of the trial judge and the decree of the court.

*James W. Kinnear,* of *Kinnear, McCloskey & Best,* for The Colonial Trust Company, receiver and trustee of John A. Wood, Jr., a bankrupt, appellant.

*William W. Wishart,* with him *J. Roy Dickie,* for Clara J. Kirkland, appellant.

*J. A. Langfitt,* of *Langfitt & McIntosh,* for appellee.

OPINION BY MR. JUSTICE BROWN, January 5, 1914:

The facts found by the court below were all properly found. Under the evidence, they could not have been different, and the very narrow question on these appeals is whether the Central Trust Company acted within its rights under Wood's pledging agreement with it when it purchased the pledged securities on January 15, 1910. If it did so act, it became the absolute owner of the securities, accountable to no one for any profit it might subsequently realize on a resale of them, just as it could look to no one to reimburse it for any loss it might sustain: Plucker v. Teller, 174 Pa. 529. By resales of those securities, made in a few days, it realized $1,582.29 over and above Wood's indebtedness to it. If it is the legal right of the appellee to keep that money, no proceeding in equity can give it to another. Legal rights are as safe in chancery as they are in a court of law, and however strong an appeal may be to the conscience of a chancellor for equitable relief, he is powerless to grant it if the one from whom it must come will be deprived of a legal right. Relief in such a case can come only as the conscience of the one vested with the legal right may prompt him to bestow it. In the case under consideration the learned chancellor below held, and was compelled to hold, that the Central Trust Company is but exercising a legal right in holding on to the money

claimed by the complainants in the bill and cross bill, and this being so, equity can do nothing for either of them.

If the Central Trust Company was required to sell the securities at public sale, it would be well contended that such a sale was not held. Counsel for appellee concede this to be true and say of the sale that it was a private one, "made in a semi-public way." The authority given by the pledgor to the pledgee did not require a public sale of the pledged securities upon the failure of the pledgor to pay his obligations. The broad authority given was to sell "at public or private sale," at the option of the appellee, on the nonperformance of the promise of Wood to pay, and such sale could be without demand, advertisement or notice, with the right in the appellee to become the purchaser and absolute owner of the securities, free of all claims and trusts. The terms of this contract could not be clearer, and as it was a lawful one, the pledgor and his trustee in bankruptcy are bound by it, and the pledgee, in the absence of fraud, had the right to become the absolute purchaser of the securities at a private sale: McManus v. Sweatman, 22 W. N. C. 54; Jeanes's App., 116 Pa. 573; Hiscock v. Varick Bank of New York, 206 U. S. 28. Nothing done by the pledgee, from the time it took the securities from the pledgor until it sold them, bears the slightest taint of fraud, and that it was justified in selling them in the manner complained of by the appellants is made clear by the following facts found by the court below: "When the pledgee learned of the failure of the pledgor it made immediate investigation of the character of the securities in its hands, with a view to protection against loss. The market value of some of the pledged stocks was at times of little value; some were speculative and non-dividend paying, and at the time of the sale the market was on a decline, and had the sale been delayed for a month longer the pledgee would have sustained a loss. The Westinghouse stocks were of companies then

in financial difficulties. There was no proof that the securities as a whole were worth, on the day of the sale, more than the amount of the pledgee's claim."

Under the terms of the note, the securities pledged for its payment might have been sold by the trust company at private sale, without demand upon the maker to pay and without notice to him that such sale would be made. This, however, was not done, though the securities pledged by the adjudged bankrupt were held on a fluctuating and declining market. On January 14, 1910, demand was made upon the trustee in bankruptcy for payment, and, upon his refusal to pay, notice was given him that the collaterals would be sold. What was done by the appellee in selling them was lawfully done, and the title which it acquired was an absolute one. On this unanswerable legal proposition it has a right to stand when alleged equities are asserted against it.

No distinction can be made between the claim of Clara J. Kirkland, the victim of Wood's perfidy, and that of the complainant in the original bill. She executed the power of attorney in the usual form on the back of her stock certificate, without restriction or condition, and the appellee took it and held it as an innocent pledgee, without notice, divested of all claims that she might have upon it: Wood's App., 92 Pa. 379; Gilbert v. Building Association, 184 Pa. 554; Cochran v. Fox Chase Bank, 209 Pa. 34; Shattuck v. American Cement Co., 205 Pa. 197; King v. National Bank, 227 Pa. 22. On the day this particular stock was sold and purchased by the appellee no surplus was realized from the sale of all of the securities to be accounted for to either of the two appellants.

Appeals dismissed and decree affirmed at the costs of appellants.

DISSENTING OPINION BY MR. JUSTICE STEWART:

Though the trust company was an innocent holder of the certificate for twenty-five shares of stock in the Cru-

cible Steel Company, the stock was nevertheless, except as distinguished by legal technicality, stolen property; and this fact was brought to the knowledge of the trust company before it undertook to convert the stock. The trust company held this stock along with a variety of other stocks as collateral to the debt owed it by John A. Wood, Jr., from whom it received the certificate. Under such circumstances, with the fact brought home to it that the Crucible Steel stock had been embezzled, that it was not the property of Wood who pledged it, but was the property of Mrs. Kirkland, did any duty attach to the trust company, as affecting the rights of the owner of the stock? I am not questioning the right of the trust company to use this stock for its own protection against loss on the loan to Wood, and to exhaust it if necessary to that end. What I assert is that common honesty, to say nothing of decorous regard for the right of another who had been fraudulently imposed upon and defrauded, ought to have suggested to the trust company a moral obligation it was under to confine the fraudulent pledge it received to simple indemnification; that any attempt on its part to derive more would be but an effort to reap benefit or advantage from embezzlement perpetrated by another. On the same morning the trust company was notified of the embezzlement of this stock, in the office of its secretary, it auctioned off to itself, in one lot, all the stock that Wood had pledged, including the stock of Mrs. Kirkland, for a sum equal to the indebtedness of Wood to the bank. It immediately placed all of the stock that it had thus come to own, in the hands of a broker and sold it, with the result, that it realized, over and above the payment of Wood's indebtedness, the sum of $1,500.00 profit. This profit represents the value of Mrs. Kirkland's stock. The transaction, however it may be regarded with respect to the stock honestly pledged by Wood, takes on a very different aspect when we come to consider Mrs. Kirkland's relation to it. Hers was the stock, subject to the right of the trust company to in-

demnity thereout. The trust company knew it was Mrs. Kirkland's. When it auctioned off the stock that had been pledged to it, it knew that included in the lot was the stock that had been virtually stolen from Mrs. Kirkland. It was bound by every moral and equitable consideration to distinguish the stolen stock from the others, and sell it only as the other stock proved insufficient for its indemnification. The subsequent conduct of the trust company in throwing the stock on the public market on the same day of its auction sale to itself, is to my mind persuasive evidence that the auction sale, made in the way it was, was intended as a transaction whereby the trust company might reap advantage from the stock over and above simple protection. Why the trust company sold to itself the stock in bulk rather than by the usual method, which it the same day adopted when it sold the stock as its own, is without other explanation. The maxim sic utere tuo ut alienum non laedas has a legal meaning apt to be obscured by a too literal translation of its terms. In its legal signification it means: so use your own property as not to injure the rights of another. Broom's Legal Maxims, Sec. 328. The trust company had a right to use this particular stock for its indemnity; but only in case it was required for that purpose. Whether it would be required could only be determined upon the sale of the other securities which it held, the ownership of which was not in dispute. It was the bounden duty of the trust company, because of the circumstances we have adverted to, notwithstanding the contract with Wood admitted of its doing what it did, to sell this stock in the usual way on the general market, and sell Mrs. Kirkland's stock only in case the other stocks did not realize sufficient to indemnify the company. By the sale of the stock to itself the trust company did not become an innocent purchaser for value: it bought with full notice of the fact that the stock belonged to Mrs. Kirkland, and therefore her rights remained just what they were before. With her owner-

ship admitted or established, equity, with respect to this stock, would have regarded her as but surety for Wood to that extent, and for her protection would have enjoined a sale of it until it had been made to appear that its conversion was required for the full indemnity of the trust company. Such being my view of the case, I would sustain Mrs. Kirkland's appeal.